UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:03CV-166-R

KIMBERLY BURGESS, et al.                                                    PLAINTIFFS

v.

PADUCAH AREA TRANSIT AUTHORITY, et al.                       DEFENDANTS

## MEMORANDUM OPINION

Defendants have filed Motions to Alter, Amend or Vacate (Dkt. Nos. 111, 112 and 113)

pertaining to the Court's Memorandum Opinion and Order issued May 23, 2005, denying in part

and granting in part their Motion for Summary Judgment.  Plaintiffs responded (Dkt. Nos. 115,

116 and 125), Defendants replied (Dkt. Nos. 119, 120 and 121), and this matter is now ripe for

decision.  Defendants' Motions as to Plaintiffs Turner and Burgess will be **GRANTED**; their

motion as to Plaintiff Glisson will be **DENIED**.

## BACKGROUND

In its May 23, 2005 Memorandum Opinion, the Court granted in part and denied in part

Defendants' summary judgment motion.  The facts in the case are set forth generally in that

opinion, and more particularly where appropriate for purposes of efficiency.  Defendants have

since filed three separate motions seeking various rulings on each Plaintiff's claims; one for

Kimberly Burgess, one for Karen Glisson, and one for Shelly Turner.  They seek to have the

order vacated on several grounds as to each Plaintiff.  This opinion will therefore address the

claims of each Plaintiff separately.

## ANALYSIS

**Official Immunity of Kim Adair**

Defendants correctly note that the Court's Memorandum Opinion omitted a section ruling

on the claim of Kim Adair that she is entitled to official immunity from the instant lawsuit.  The record indicates that Adair, in her role as Operations Manager, did not have the authority to terminate P.A.T.S. employees; therefore, she cannot have violated the Plaintiffs' constitutional rights.  Plaintiffs' claims against Adair are therefore **DISMISSED.**

**Official Capacity Claims**

Defendants argue that the official capacity claims should be dismissed because Plaintiffs named the entity (the Paducah Transit Authority), which is the real party in interest.  *Fultz v. Whitaker*, 187 F.Supp.2d 695, 708 (W.D.Ky. 2001).  The Court agrees, and all official-capacity suits will be dismissed as redundant.

**Plaintiff Shelly Turner**

*Retaliation*

With respect to Turner's retaliation claim, Defendants argue that the Court is required by the United States Supreme Court decision in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), to go beyond its analysis of the Plaintiffs' prima facie case to determine whether the Defendants would have terminated the Plaintiffs even in the absence of the protected speech.   (Dkt. # 111 at 5.)  The Court agrees that binding precedent requires this step before summary judgment may be granted or denied.

In *Mt. Healthy*, the Supreme Court reviewed a case involving a school teacher faced with adverse employment action from the Board of Education.  The teacher had successfully made out his *prima facie* case for retaliation. Nevertheless, the Supreme Court remanded the case because, it said, "...the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to [the adverse

employment action] even in the absence of the protected conduct." *Id.* at 287.

In *Matulin v. Village of Lodi*, the Sixth Circuit described the causation test from *Mt. Healthy* as follows:

> the plaintiff has the burden of proving that his speech was a "substantial" or "motivating" factor in the employer's decision to terminate his employment. The burden then shifts to the employer, who must be given an opportunity to prove that the plaintiff would have been fired even if he had not engaged in the protective conduct. The matter of causation is an issue of fact which must be decided by the jury.

862 F2d 609, 613 (internal citations omitted). As discussed in the Court's earlier Memorandum Opinion, Turner has raised an issue of fact sufficient to defeat summary judgment on the question of whether her protected speech was a "substantial" or "motivating" factor in her discharge. For summary judgment on the issue of causation to be appropriate, then, Defendants must demonstrate that "no reasonable jury could find to the contrary that [plaintiff's] speech did not motivate her discharge at least in part." *Langford v. Lane*, 921 F.2d 677, 683 (6th Cir. 1991). In other words, in accordance with the ordinary summary judgment standard, Defendants must demonstrate that no reasonable jury could find that Defendants would *not* have discharged Turner for her actions on Saturday, July 13 independent of any protected speech. The Court finds that Defendants have so demonstrated with respect to Plaintiff Turner. Ms. Turner was terminated because, knowing that Burgess had been terminated, she surreptitiously met with Burgess on a weekend, allowed her to enter the P.A.T.S. office, and allowed Burgess to access the computer system in violation of an agreement that Turner signed to protect confidential information contained therein. (Dkt. # 44, at 90-94; 98-99). Turner's actions on Saturday, July 13 were so inappropriate that to prevent Defendants from terminating her because she engaged in protected speech would violate the principles of *Mt. Healthy*, where the Supreme Court

3

emphasized that an employee "ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision ... on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."  429 U.S. at 286.

*Wrongful Termination*

Plaintiff Turner also brought a claim for the tort of wrongful termination under Kentucky law, under the established theory that, even in at-will employment situations, a termination in violation of certain public policies is wrongful.  *See, e.g., Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730 (Ky. 1983).  Kentucky law puts strict limits on these "judicial exceptions" to the at-will employment rule:

> 1) The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.
> 2) That policy must be evidenced by a constitutional or statutory provision.
> 3) The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985).  In that case, the Kentucky Supreme Court went on to adopt a Michigan Supreme Court decision describing the situations in which a termination was actionable on public policy grounds:

> First, "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment." Second, "when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment."

*Id.* at 402, quoting *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710 (Mich. 1982).  The allegations supporting Turner's wrongful termination claim are as follows:

As Project Manager, Turner was responsible for submitting HSTD Vehicle

4

Inspection Checklist forms to the Kentucky Transportation Cabinet, Office of Transportation Delivery, Commonwealth of Kentucky certifying that vehicles had passed inspection and were in sound mechanical condition. ... On several occasions Kitchen [*sic*] ordered vehicles back in service when they were removed by a vehicle inspector. ... The Plaintiffs were aware of Kitchin's practice.  The Plaintiffs were aware that the documents were not accurate.  When brought to his attention Kitchin would order the documents sent without clarification as to the status of the vehicles.  Kitchin would not permit any changes to the document and did not advise the inspector of his decisions to override her authority.  The Plaintiffs refused to comply with sending the documents to the Commonwealth without change. ... The Plaintiffs were terminated for their refusal to submit false information to the Commonwealth and its agencies.

(Plaintiffs' Response, Dkt. # 24, at 34-35).  Turner claims that "KRS 517.050 and 523.100 are well defined statutes which prohibit the conduct requested by Kitchin."  (*Id.*)  The two statutes cited provide as follows:

KRS 517.050 Falsifying business records

(1) A person is guilty of falsifying business records when, with intent to defraud, he:
(a) Makes or causes a false entry to be made in the business records of an enterprise; or
(b) Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or
(c) Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or
(d) Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.
(2) Falsifying business records is a Class A misdemeanor.

KRS 523.100 Unsworn falsification to authorities

(1) A person is guilty of unsworn falsification to authorities when, with an intent to mislead a public servant in the performance of his duty, he:
(a) Makes a material false written statement, which he does not believe, in an application for any pecuniary or other benefit or in a record required by law to be submitted to any governmental agency;
(b) Submits or invites reliance on any writing which he knows to be a forged instrument, as defined in KRS 516.010; or
(c) Submits or invites reliance, except as provided in KRS 516.110, on any

sample, specimen, map, boundary mark, or other object he knows to be false.
(2) Unsworn falsification to authorities is a Class B misdemeanor.

Turner's response memorandum fails to cite the record for any support for the allegation that she refused to send the documents in question, and the Court can find no such assertions in the depositions or affidavits filed in this case.  She states that she was terminated because of the Saturday, July 13 issue.  (Deposition, Dkt. # 44, pp. 88-89).  Further, Alpha Mae Tate, the safety inspector, affirmatively states in her deposition that Kitchin supported her decisions to pull vehicles from service, and that it was the individual contractors, rather than Kitchin, that sometimes put vehicles into service that she had previously removed.  (Dkt. # 43, at pp. 83-85.) The failure to support this allegation is fatal to Turner's wrongful termination claim.

Also, the Court notes that the conclusion reached under the *Mt. Healthy* analysis above leads to the conclusion that Turner would fail to make out a *prima facie* case for wrongful termination even if she had supported her assertion, because the causation element would fail as a matter of law.

**Plaintiff Kimberly Burgess**

As discussed in the Court's earlier Memorandum Opinion, Plaintiffs all testified that in contacting the Board, they were expressing concerns both about safety issues at P.A.T.S. and about other, non-safety issues such as the management style of Kitchin.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).  In interpreting *Connick*, the Sixth Circuit has said that:

it is hard to see how any aspect of the operation of any department of any public

> body could be said not to constitute a legitimate subject of public concern.
> *Connick* instructs us to examine both the content and the context of the
> employee's statement, however, and the Court's opinion seems to suggest that if,
> having done so, we find that the employee's personal interest *qua* employee
> predominates over any interest he might have as a member of the general public,
> we are not to intercede.  "The First Amendment does not require a public office to
> be run as a roundtable for employee complaints over internal office affairs."

*Brown v. City of Trenton*, 867 F.2d 318, 321-22 (6th Cir. 1989) (quoting *Connick*, 461 U.S. at

149).  Further elucidating this test, the Sixth Circuit in *Chappel v. Montgomery County Fire*

*Protection Dist. No. 1* said: "Whether an employee's statement is predominated by 'the

employee's personal interest *qua* employee' is primarily a content-based inquiry, not an

exclusively motive-based inquiry."  131 F.3d 564, 575 (6th Cir. 1997).

Because the letters themselves do not contain a description of the issues their signers

sought to raise, the Court must look to deposition and affidavit testimony to determine whether

there is an issue of fact with respect to the content of the speech.  Burgess's deposition testimony

says: Q: "And would you say that in signing this letter your primary concerns were Gary's

management style and stress level?" A: "Yes, mostly."  (Dkt. # 46, at p. 44).  In her affidavit,

Burgess states only that "Karen Glisson told Mr. Kitchin that the letters were sent because of

safety concerns for drivers because the buses were in poor mechanical condition."  (Affidavit,

Exhibit 12 to Dkt. # 24, at ¶ 4.)  In this situation, it is particularly difficult to differentiate

Plaintiff's motive in sending the letter from its content; however, her deposition testimony

reveals her mind-set and is clear that she felt her concerns about Kitchin's management style

predominated over her concerns about safety.  There is nothing contained in the content of any

of her speech to indicate differently.  Therefore, her signing the letters was not protected speech

under the *Connick* standard, and summary judgment on her retaliation claim is appropriate.

7

*Wrongful Termination*

The same public policy requirement for a wrongful termination applies to Burgess as applied to Plaintiff Turner, *supra*.  The same statutes are relied upon (KRS 517.050 and 523.100) and the same lack of support for the allegations requires summary judgment on Burgess's claim. In her deposition, Burgess testified as follows:

> Q: "Nowhere in the grievance do you mention that you believe you were terminated for attempting to report alleged safety violations, do you?"
> A: "No, ma'am.  This was just over my discharge."
> Q: "Okay.  So do you believe that you were discharged because of the information that was wrong in the computer system?"
> A: "No.  I believe I was discharged because I signed the letter to the board."
> Q: "Okay.  And so --"
> A: "And the safety issues that were ignored and they didn't want to hear about."

(Deposition, Dkt. # 46, at p. 92.)  Burgess's deposition contains no references to any falsified forms or documents or anything else that could be construed as related to those Kentucky statutes.  Therefore, summary judgment is appropriate.

**Plaintiff Karen Glisson**

*Retaliation*

The *Mt. Healthy* analysis leads the Court to a different result when applied to Plaintiff Glisson.  Several incidents preceded Defendants' termination of Glisson, and a close examination of the record is required to determine whether, as with Ms. Turner and Ms. Burgess, those events would have given rise to Glisson's termination independent of her protected speech. The Court finds that there are genuine issues of material fact in dispute as to the circumstances surrounding these events, and without a jury's resolution of those issues, the *Mt. Healthy* question cannot be answered.  Defendants assert that Glisson was terminated as a result of incidents involving

"[c]alling [her] supervisor a liar, telling him that his pretentious use of the policies and
procedures is a joke, asking [her] supervisor if her husband knows that she is messing around
with someone else, and yelling at a co-worker." (Motion, Dkt. # 113, at 5). Defendants
further assert that these are "surely sufficient to establish that no reasonable juror could conclude
that Defendants did not have sufficient grounds to terminate" Glisson. (*Id.*).

A more in-depth description of the events alluded to is required. In the initial summary
judgment motion, Defendants relied only upon the last two, and in fact the last two were the only
reasons set forth in the written explanation for Glisson's termination. They refer to an incident
between Glisson and Adair and an incident between Glisson and Angelina Jones, a fellow PATS
employee. The incident with Adair involved something Glisson said to Adair when Adair was
walking with her husband into the PATS building in August, 2002. According to the
Disciplinary Action letter, Glisson "yelled out to [Adair] and [her] spouse as they were returning
from lunch and at the garage door of P.A.T.S. 'Does your husband know you're messing around
with someone else?'" (Exhibit 10 to Dkt. # 45). In her deposition testimony, Glisson described
her relationship with Adair as being a joking one, in which both she and Adair teased each other
and used language which people who did not have a joking relationship would probably find
objectionable. (Dkt. # 45, at 126). She also said that she had made the same or similar jokes
with Adair and her husband before, and that both Adair and her husband had laughed. (*Id.* at
128).

The Disciplinary Action letter also describes the incident with Jones: Glisson "yelled at
[a] fellow employee and made accusations towards the employee in an attempt to either question,
embarrass, intimidate or reprimand the employee in regard to actions concerning other

9

ex-employees."  (Exh. 10 to Dkt. # 45).  In her deposition testimony, Glisson described the

encounter as follows:

> I was sitting at my desk doing my work.  Angie walked in trying to sell me some
> Wrap-a-Rama stuff that her ... son was selling.  And I told her I was busy, I had to
> get this done, I didn't want to buy anything.  And she just stood there and kept
> talking and kept talking and kept talking, and I said "I don't have time for this.
> Leave me alone."  And she just kept on.  And then I just - - I had so much
> pressure on me ... I just unloaded on her.  I said it in a calm way. I didn't scream.
> I didn't yell. ... I just said, "Angie, why did you sign the letter?"  And she knew
> which letter I was talking about.  And she said, "Well, how do you know about
> the letter?"  I said "Why did you sign it?"  I said, "That was - - that was stabbing a
> knife in Shelly's back."  And she said, "Well, did you sign the letter?"  I said,
> "No."  I said, "She's done everything she can do to keep your job for you."  I said,
> "She went to bat for you when you were off so many times, when you'd come in
> late, an hour or two late, an hour late for lunch, when you had trouble with your
> ex-husband."  I said, "She stood up for you.  She tried to save your job, and then
> you sign a letter against her."  I said, "I don't want to talk to you."  And I shut up
> and ignored her.  And finally, she walked out the door.  But I did not yell.  I did
> not raise my voice.

(Dkt. # 45, at 130-132).  This description, obviously, relates a very different situation from one

involving "yelling" and "making accusations."

   Viewing the facts in the light most favorable to the Plaintiff, these two incidents are

categorically different from the incidents giving rise to the termination of Plaintiff Turner, as

well as the terminations in the cases relied upon by Defendants.  The incidents which gave rise to

the termination of Turner involved conduct with potentially serious, immediate consequences,

and were not incidents that were simply "discourteous," as Defendants described Glisson's acts

in their Disciplinary Action letter.  Defendants cite *Garvey v. Montgomery*, a political discharge

case in which the Sixth Circuit ultimately found that the "evidence indicated that the employee

was unable to manage his department effectively, as objectively evidenced by his own personnel

record." 128 Fed. Appx. 453, 461 (6th Cir. 2005).  The court went on to describe a series of

performance reviews and disciplinary actions that reflected poor management on the plaintiff's part, and noted that the defendants had consistently asserted that this poor performance was the basis for plaintiff's termination. *Id.* at 461-62. The two incidents at issue in Glisson's case do not involve job performance and do not rise to the level of "rank insubordination" discussed in *Langford*. 921 F.2d 677 (6th Cir. 1991). A reasonable juror could find that Glisson was terminated for a joke and a quiet, if somewhat confrontational, conversation with a co-worker; if a jury did so find, the Defendants would not have had reason to terminate Glisson under the *Mt. Healthy* standard.

*Wrongful Termination*

The same public policy requirement for a wrongful termination applies to Glisson as applied to Plaintiff Turner, *supra*. The same statutes are relied upon (KRS 517.050 and 523.100) and the same failure of support requires summary judgment. In her deposition, Glisson testified as follows:

> Q: "Did Kitchin or Adair ever ask you to alter any records or reports?"
> A: "I don't know whether you would call it altering records or reports or not, but I've got - these were - did you make copies of these?"
> Q: "Yes. Let me see."
> A: "These - those were reports that Alpha, when she'd go out and make her state- - you know, go out and do her inspections, she'd give those to me, and then I would go into a program in the computer and make sure that the license plate number and the VIN number all matched. And if they were taken out of service, I would write - I would type in what date they were taken out of service, so when I did the billing, it would all come up the way it's supposed to come up. And I would do that. And then when the vehicles would be back in service, I didn't get a notice. The providers were supposed to give me a notice saying that this vehicle is back in service. And then when we'd - I'd enter my - you have to enter a driver number and a vehicle number. And if you didn't have a number for the vehicle, you'd just put "01." So that's how I would do that. And then I went and asked Gary if I was supposed to continue doing that or what I was supposed to do about that, and he said, "Don't worry about it." And then a couple of days later, I was taken out of that program. So I don't know whether you call that -"
> [...]
> Q: "Okay. So how - and then maybe what I'm not understanding is the latter part of it

where you said something about talking to Gary."

    A: "When - after I'd put those in there, I'd do the billing.  You'd have to put a vehicle number in, like it was 2001 or - no, we didn't - 2002 or 2003 or something like that would be a driver number, or 2023.  That would be the vehicle number.  And then when I'd go back in after I took it out of service, that number wouldn't pop up.  When I'd put it in, it wouldn't take it.  So then I'd have to put in, like, 2001, because that was a ghost number we used.  And I think I only talked to him one time about it that I went in - and it was when we were at the new building.  I went in, and I said 'I had to change these because these weren't right in that- "

    Q: "What wasn't right?  The VIN numbers matching the license plate numbers?"

    A: "Yeah, they didn't match, and some of them, they were taken out of service.  So when they were taken out of service, I took their name off the - that vehicle off the - out of service.

    Q: "Uh-huh."

    A: "And I went in and told him that that number wasn't popping up, 'What do you want me to do?'  And he said "Just use 01."  And so that's what I did.  So I don't know whether that - if you categorize that as changing.  I don't know."

(Dkt. # 45, at pp. 143-147.)  Although these occurrences, if true, may represent record-keeping procedures that are not ideal, they do not support a wrongful termination claim.  The Court cannot discern, and Plaintiff does not explain, how these occurrences would be misleading to a Commonwealth official; more importantly, there is no indication that Glisson *refused* to do anything Kitchin asked her to do in this regard.  That refusal is a requisite for the wrongful termination claim; because Glisson has not shown it, summary judgment is appropriate.

**Defamation**

    With respect to the defamation claims, which remain only as to Plaintiffs Turner and Burgess, the Court finds that summary judgment as to the defamation claims should be granted.  Defendants argue that, as to Burgess, the released document:

> merely explains in detail (1) that a phone report was generated that indicated that Burgess was grossly inefficient in her job - - that was true.  The phone report did show that Burgess was grossly inefficient; (2) that Burgess had come to PATS following her termination and accessed PATS' computer system - - that was true; and (3) that in accessing PATS' computer system, she violated the confidentiality/security agreement [which] clearly states that the employee may not access the Medicaid information [...] for reasons other than for assigned job duties.

(Dkt. # 111, at 14).  The Court disagrees with this characterization of the documents'
relationship to the truth; for example, there are factual disputes about whether the phone report
accurately indicated that Burgess was "grossly inefficient."  Similarly, Defendants assert that the
information released about Turner:

> merely explains in detail (1) that a phone report was generated that indicated that
> Turner was found in PATS on a Saturday, gathering factual information for
> Burgess - - that was true - - Turner admitted that; (2) that Turner improperly
> allowed a terminated employee improper access and disclosure of confidential
> information - - that was true; (3) that Turner became hostile to Kitchin - - Turner
> disputes this; and (4) that in accessing PATS' computer system, she violated the
> confidentiality/security agreement that she signed on October 11, 1999 - - - a
> review of the Confidentiality/security agreement clearly states that the employee
> may not access the Medicaid information except for reasons other than for
> assigned job duties.

(Dkt. # 112 at 14).  As Defendants note, disputes of material fact exist as to the information
contained in the report.

Nevertheless, because the Court finds that the Open Records Act required release of the
document, summary judgment on the defamation claims is appropriate.  Because the employees
were not required to grieve their terminations, the disciplinary actions taken by Kitchin could
have been the final action; therefore, KRS § 61.878 does not exempt the records from the
requirements of the statute.  Because the statute applies, Defendants were required by law to
release the documents; their publication is therefore absolutely privileged.  *Restatement (Second)*
*of Torts* §592A (1977).  Summary judgment on the defamation claim is therefore appropriate.

In summary, then, the only claims remaining in the case are Plaintiff Glisson's retaliation
claim against Defendant Kitchin and the Board of Directors / Paducah Transit Authority.  There
are fact issues with respect to these claims which are appropriate only for a jury to determine.

13

Finally, the Court's earlier Memorandum Opinion contained typographical errors.  The fourth sentence in the second paragraph on page 13 should read: "If the facts are as Plaintiffs allege them to be, no reasonable public official could fail to conclude that Plaintiffs' speech addressed matters squarely within the public concern; therefore, no reasonable official could believe that terminating them on that basis is within the law."

The Court notes that ruling on the various motions took much longer than normal and than anticipated by the Court and certainly the parties.  The parties are well represented and the briefs contained conflicting opinions of the testimony.  At times, references to the record were absent.  Frequently there were only general references to the record.  The Court again reviewed the numerous depositions, affidavits and documents filed in the case.  At times the deposition testimony did not follow a time line order.  The questions and responses were not necessarily related to the previous questions and responses.  It required numerous readings to resolve the arguments made by the counsel and the contents of the testimony.  Furthermore, at times the witnesses, as well as the lawyers, made conclusory statements not supported by the record.  The Court realizes that the delay was an inconvenience to the parties.  The issues raised by all parties simply necessitated multiple reviews of the record.

## CONCLUSION

For the reasons stated above, Defendants' Motions to Alter, Amend or Vacate are **GRANTED in part and DENIED in part**.  An appropriate order shall issue.

14